UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

v.

JHONNY LUCERO BOJORGUEZ,

Defendant.

Case No. 26-40001-TC

Topeka, Kansas
Date: January 15, 2026

(Pages 1-77)

. . . . . . . . . . . . . . . . . . . . . . . . . .

# TRANSCRIPT OF DETENTION HEARING

BEFORE THE HONORABLE RACHEL E. SCHWARTZ
UNITED STATES MAGISTRATE COURT JUDGE

A P P E A R A N C E S

For the Plaintiff: Mr. Stephen Hunting
United States Attorney's Office
290 U.S. Courthouse
444 Southeast Quincy
Topeka, Kansas 66683

For the Defendant: Ms. Hunter Lindquist
Mr. Kirk C. Redmond
Federal Public Defender's Office
632 Southwest Van Buren Street
Suite 200
Topeka, Kansas 66603

Interpreter: Carlos Castillo

Proceedings recorded by machine shorthand, transcript produced by computer-aided transcription.

I N D E X


| Government's Witnesses: | Page |
| --- | --- |
| MATTHEW JOHNSON | |
| Direct Examination By Mr. Hunting | 39 |
| Cross Examination By Mr. Redmond | 43 |

| Defendant's Witnesses: | Page |
| --- | --- |
| JHONNY LUCERO BOJORGUEZ | |
| Direct Examination By Ms. Lindquist | 25 |


E X H I B I T S

(No exhibits were offered or admitted).

(Called to order).

THE COURT: Good afternoon. We are here today in the case United States of America versus Jhonny Lucero Bojorguez — sorry about that — Case No. 26-40001.

Let me start today by asking Ms. Kliem to swear in our interpreter.

(Interpreter sworn).

THE COURT: Counsel, may I please have the appearances, starting with counsel for the government.

MR. HUNTING: Good afternoon, Your Honor. May it please the court. Appearing on behalf of the plaintiff, Stephen Hunting.

MS. LINDQUIST: Good afternoon, Your Honor. May it please the court. Mr. Lucero Bojorguez appears in person, in custody and with attorneys Hunter Lindquist and Kirk Redmond.

THE COURT: Thank you.

Well, let me start today to see if we are in the same position we were at our last hearing. We are scheduled here today for a detention hearing.

Mr. Hunting, is the government still requesting detention today?

MR. HUNTING: It is, Judge.

THE COURT: And, Ms. Lindquist, still requesting a detention hearing today?

MS. LINDQUIST: Yes, Your Honor. We would start at

step one and argue that a detention hearing is not authorized, but we're prepared to move forward today.

THE COURT: All right. Mr. Hunting, I am going to start with you. And let me start by asking, as we look at 18 U.S.C. Section 3142(f), does the government move for detention pursuant to (f)(1) and/or (f)(2)?

MR. HUNTING: Under (f)(2), Your Honor.

THE COURT: And which portion of (f)(2)? Are we looking at (A) and/or (B)?

MR. HUNTING: (A), Your Honor.

THE COURT: And does the government contend that there is a rebuttable presumption that applies here today?

MR. HUNTING: No, Judge.

THE COURT: All right then. As Ms. Lindquist indicated, we're going to start today with what I have characterized as the step one analysis, which is the government has the obligation to establish it has a right to move for detention pursuant to 18, United States Code, Section 3142(f)(2).

Mr. Hunting, let me make sure that we are on the same page here today. Would you agree that -- well, let me ask a better question.

What is the government's burden on the step one analysis?

MR. HUNTING: As the court is aware and has mentioned

previously in other hearings, there's a bit of a split out there among that. It's rather uncertain. We would acknowledge today it's by a preponderance, Judge.

THE COURT: And, Ms. Lindquist, do you dispute that the standard I should be applying in this step one analysis is a preponderance of the evidence?

MS. LINDQUIST: We do not dispute that.

THE COURT: Okay. And then, Mr. Hunting, my second question in these hearings is always what are the factors the government is pointing to that I should be analyzing in making this step one analysis?

MR. HUNTING: Thank you, Judge.

Judge, the government would direct the court to the factors that were laid out in the *Pavon-Andino* case. The court has used this in previous hearings where we have been similarly-situated. They're not an exhaustive list, but it is a good starting point.

Those factors would be incentive to flee, the ability to flee, ties to the jurisdiction and the United States, reliability and trustworthiness of the defendant, prior violation of the terms of the supervised release, multiple unlawful entries into the United States, prior failure to appear when required in state court, use and possession of fraudulent identity documents, and then the severity of the potential punishment and the weight of the evidence against the

defendant.

We would ask the court to consider those factors and those likely were listed in *Pavon-Andino*, Judge.

THE COURT: And there are cases around the country that also look at the traditional 3142(g) factors. What is the government's position with regard to those factors? Many of which overlap with the factors in *Pavon-Andino*.

MR. HUNTING: I believe they could be considered, Judge, and there is considerable overlap between the two.

THE COURT: Ms. Lindquist, let me turn to you just with this issue of what factors is the defense alleging that I should be applying in this step one analysis?

MS. LINDQUIST: Your Honor, we're comfortable proceeding under the factors that the government has articulated from *Pavon*.

THE COURT: All right. Mr. Hunting, how do you wish to proceed here today?

MR. HUNTING: By proffer, Judge.

THE COURT: And just a reminder to everyone, we do have an interpreter here today, so be careful of your speed.

MR. HUNTING: Thank you, Judge.

Judge, in this particular instance the defendant is alleged to be within the United States illegally. But as outlined in the, I believe, pretrial services report as well as the information that the government -- its understanding of the

information throughout the course of this investigation, the government -- the defendant has not previously been in the United States and then been subject to a removal order and then subsequently removed.

It is the government's understanding that the defendant is here illegally, but this is essentially -- as evidenced by Count 2 of the indictment, it is an illegal entry charge that he is faced with. There has been no prior finding or order of removal for this particular defendant.

In terms of his incentive to flee — to start with the *Pavon-Andino* factors — his ability to flee, his ties to the jurisdiction in the United States, those particular areas, it's the government's understanding that the defendant was working in Washington, Kansas. He was living at a rental property along with other workers.

And I believe one of the employers in the area would get labor from a temp agency to which the defendant had provided paperwork to when he was hired as a worker. He was able to find housing. And it is a rental and, again, it is with other workers that are similarly-situated to him.

Whether they're all -- that is not to say in a blanket statement that all of their statuses are legal or illegal, it's just you have several people who are living in this rental property that are there because they work or have been placed through this temp agency to do farm work throughout the

community in Washington, Kansas.

There is no indication that he has any family in the state of Kansas. There's no indication that he has any family or close ties to anyone in Washington. And in addition, the defendant had -- when -- was under surveillance by ICE agents in this particular matter. They were able to determine that he had multiple vehicles at least registered to him that were parked at, near, or around the property to which he had listed as his address from which he was renting essentially, Judge. And so he has several different vehicles available to him. He has little or no ties to Washington, Kansas, the state of Kansas or even the United States.

When he was interviewed in a post-*Miranda* interview with the ICE agent, he indicated that he entered the United States, he entered the United States illegally. He crossed the border, he did not check in with anybody, he did not go through any of the proper procedures or things of that nature and he eventually made his way up to Washington, Kansas.

In terms of all of that, those factors certainly weigh in favor of the United States.

In terms of his incentive to flee, he -- he hasn't -- and the government would submit to the court that thus far he has demonstrated that he is likely to be a serious risk of flight and he has an incentive to flee.

When agents came into contact with the defendant, that

was the day that he was arrested, he was driving a vehicle, it was daytime, it was in Washington, Kansas, and it was not far from a convenience store/gas station. That convenience store/gas station had operational video that captured the car stop of the defendant and his interactions with the ICE agents.

The ICE agents were in an unmarked vehicle, but at the time that the car stop was initiated, they activated lights. So there were emergency lights flashing through the vehicle. In addition, when they got out of the vehicle the agents were wearing tactical gear and vests that clearly indicated who they were essentially.

There was identification made by the officers right away and there was a brief conversation. And what the video -- although it does not have audio, the video captures kind of the interaction between the agents and the defendant. And the defendant upon hearing that he was going to be placed under arrest, you know, agents reaching for their handcuffs, the video shows the defendant trying to get back into his car, which the government's understanding is it may even have still been running at that particular time.

The door was open, he tried to get back into the car. The agents then had to grab him, pull him from getting into the car fully, and then there was a struggle between the agents and the defendant to have him basically give up his hands so that he could in fact be handcuffed.

The struggle took not a matter of moments, not a matter of seconds, but it lasted for approximately about ten minutes essentially before the defendant finally complied with the agents' attempts to place him in handcuffs so that he could be taken fully into custody and then transported to a facility.

Now, in this particular case his behavior right there demonstrates not only that he's a serious risk of flight but that he does have incentive to flee. He knows that if he is taken into custody, things that he doesn't want to have happen to him are going to happen to him.

In addition, the defendant, as I indicated, he indicated in his post-*Miranda* statement that when he entered the United States, entered it illegally, he then secured employment. And when he secured the employment, he filled out an I-9 Form, he put on that I-9 Form a false Social Security number. He also put on that I-9 Form a false alien number. And it's the government's position that it is likely that at some point while the defendant was here he had or still has somewhere fraudulent identity documents as it pertains to Social Security numbers and alien numbers.

Now, there is nothing in this particular case -- or, excuse me, with this particular defendant that suggests that there have been prior violations of the terms of supervised release. The government is not aware of anything as to that.

We're not aware at this point of multiple unlawful

entries into the United States, but we are aware of at least the one that he confessed to. We're not aware of any prior failures to appear when required in state court.

And in terms of the severity of the potential punishment and the weight of the evidence against him, in terms of the potential punishment in this particular matter, as outlined in the indictment and the complaint, statutorily he's looking at a term of imprisonment of not more than five years for Count 1 and a term of imprisonment of not more than six months for Count 2.

Regardless, there's nothing to indicate that at any point he's been incarcerated thus far, so that potential amount of time would be considered significant by many. As to the -- what the sentencing guidelines will come down to, the government would acknowledge that if the defendant does not have any criminal history it will be less than those statutory maximums but fairly -- related to other federal sentences, not an earth-shattering amount of time.

When we talk about the reliability and trustworthiness of the defendant, the government believes that the statements of the defendant suggests that he is one who has little or no respect for the law. He clearly entered the United States in a way that was unlawful to do so. He then went and secured some type of documentation somewhere so that he could then fill out forms to become employed using a false Social Security

numbers as well -- or a Social Security number as well as a false alien number and indicated that he was a permanent lawful resident when in fact he was not a permanent lawful resident. So he has demonstrated that he is not someone that the government would consider to be trustworthy or reliable based on those behaviors.

And so in regards to those first factors for the step one analysis, that would be the extent of the government's proffer and it is open to the court's questions.

THE COURT: I do have one question with regard to the pretrial services report. He has -- the 2024 case in Washington, Kansas, he was charged under a different name and I wanted to hear the government's view on that name.

MR. HUNTING: Judge, it's difficult to say whether that was a -- just the way that it was written down or interpreter error or whether he was in a meaningfully way trying to provide a false or different name. The government is unable at this time to determine which of the two that it is, Your Honor.

THE COURT: Ms. Lindquist.

MS. LINDQUIST: Yes, Your Honor. We have a few steps here that we would like to proceed under. First, Mr. Redmond is going to speak to the factor that relates to Mr. Lucero's ability to flee in light of the detainer that is confirmed by the pretrial services office. Then we would like to present

the testimony of Mr. Lucero Bojoguez and then we would conclude with argument.

MR. REDMOND: Thank you, Your Honor. I feel like I keep taking the microphone and talking about things that I learned this morning, and that is most certainly the case here.

We think that under immigration law Mr. Lucero must be detained until he is removed, meaning that with the existence of an ICE detainer he would remain in immigration custody for the duration of his time in the United States.

We believe that is true because of 8 U.S.C. 1226(c), which is -- requires the government to detain any alien that it catches if that alien under subsection (a) is inadmissible by reason of having committed an offense under Section 1182(a)(2) of this title.

And that -- that section, 1182(a)(2), indicates that anybody who -- or it covers anybody who has either committed -- or either been convicted or who admits having committed or admits committing acts which constitute the essential elements of a crime involving moral turpitude.

And I don't remember whether the government mentioned it or not, but Mr. Lucero did essentially confess to the elements of the two charges when he -- after he was in -- after he was Mirandized. It's also exceedingly clear under Tenth Circuit law -- we've sent the court the -- a couple of slides. They cited a case called *Castillo-Torres versus Holder*, which

is 210 Westlaw 3529413, where the court notes that — citing Seventh Circuit case — that almost all courts have held that intentionally deceiving the government involves moral turpitude and that a crime that requires fraud always involves moral turpitude. And so he has admitted to acts that -- that constitute an offense that involves moral turpitude, which means that he must be detained.

As the Supreme Court explained in the *Jennings versus Rodriguez* decision, which is 583 U.S. 281, at 289 they explained that the 1226(c) carves out -- quote, carves out a statutory category of aliens who may not be released under 1226(a). And the 1226(a) is the general provision that makes aliens, or at least some aliens, bondable.

And the *Jennings* court -- there is actually -- I should note there is an exception to the rule in -- in (c)(1) if the alien in question is needed for witness protection purposes, as the *Jennings* court explains it, and the government can certify that the person is not a danger to the community and that they do not pose a risk of non-appearance. There is no intimation that in this case Mr. Lucero is necessary for any witness protection purposes.

I think there's two more points that *Jennings* makes that I think are highly relevant here. At 303 the court says that 1226(c), the detention provision, does not on its face limit the length of the detention it authorizes, by allowing

aliens to be released only if the Attorney General decides that certain conditions are met; that 1226(c) reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute, and that the detention of those aliens within the scope must continue pending a decision on whether the alien is to be removed.

Two points from that. The first is, we don't have a 90-day removal period here. The detention -- Mr. Lucero's detention in immigration custody will continue until he is removed, which means that the court doesn't have to speculate at all about where he is going to be. He's going to be in custody. He may have other, like, things that he can do under immigration custody, but he'll be in detention while he's doing them.

And secondly, the *Jennings* court is clear that there's not other -- some other, like, implicit exception to the rule that is witness protection plus no danger to the community and no risk of flight. They say that -- because the respondents there were arguing that just because it has one carve-out for the -- in (c)(4), that doesn't mean there aren't others. And *Jennings* said that's just wrong; that the statutory text makes clear that there's one exception and this is it.

So I know we've been debating the importance of the 90-day removal period in other cases, but I don't think we have

to here. I think it's just clear from both the statutory text and how *Jennings* explains it that Mr. Lucero will be detained until he is removed because he has admitted to committing a crime of moral turpitude.

THE COURT: I understand your argument as it relates to the moral turpitude, which we'll get to in a moment, but because we do not have a prior removal order here he still has additional rights he could seek. We've talked about fear or the asylum-like process. Is it your assertion here today that there are no alternative avenues of any kind that he could pursue while in custody?

MR. REDMOND: No. It is our assertion that he will be in custody while he is pursuing those if he chooses to because there's not a way -- there's not another exception besides the exception in (c)(4) to get him out of detention.

THE COURT: And pursuant to those processes, the court could ultimately decide that he is releasable?

MR. REDMOND: I don't think so. I mean, I -- again, this is -- I don't know -- I don't want to make any grand pronouncements. What I -- all I know is what's in (c)(1) and what *Jennings* says about this is a detention that lasts until removal. And the page number on that is something I didn't write down.

THE COURT: But it's the "until removal" piece that I'm asking about. We don't have an order finding that he must

be removed as we sit here today; is that correct?

MR. REDMOND: Yes, that's correct. That's why we're under 1226 instead of 1231.

THE COURT: So there needs to be a finding by someone in an immigration court that he must be removed. Correct?

MR. REDMOND: Yes.

THE COURT: And at that point they could decide no.

MR. REDMOND: I don't know. I suppose that's true. I'm not sure what the grounds would be for that decision, like, I guess he could apply for asylum. I don't think -- I don't know, I don't know is the short answer.

THE COURT: And that's been my concern with these arguments all the way along is, sitting here today I don't believe it's possible — and correct me if I'm wrong — for you to say one of two things happens. He either sits in ICE custody forever or he is removed out of the country and that -- those are the two and only two conceivable paths here.

MR. REDMOND: Yeah, I don't think -- actually I shouldn't say that. Indeterminant detention is possible. It's also sometimes subject to constitutional limitations that I don't know how apply to 22 -- or to 1226(c)(1).

Is it possible that he could apply for asylum and be approved? Yes. Will he be in ICE custody the whole time that that process occurs? Also yes. And the -- I have no idea -- I mean, I wish I had time to brief this. I have no idea how long

it takes to apply for asylum. I know that there are often some very long stays by people in custody.

And I don't think in a case like this where -- I mean, if he's applying for asylum over a six-month period and the court detains him and he's here, this case isn't going to take six months. Like, Ms. Lindquist is going to sort of discuss some of the sentencing aspects of the case, but the short answer is no. I don't know what the potential immigration options are. I do know that he will be in custody while he exercises them if he chooses to.

THE COURT: But that leaves us back with the original problem that I've had throughout looking at these issues, is if there is a path that ICE is going to release him for any reason, why am I not just looking at the risk of flight he presents if he were to be released from ICE? As he sits here today he is not in ICE custody. We cannot say ICE is down the road -- for whatever of the various reasons, may choose to release him. Aren't I looking at the risk of flight he poses at that moment when he is released and can make volitional decisions on his own behalf?

MR. REDMOND: So I don't think so for a couple of reasons. Number one, I think he is in ICE custody. This idea of having separate custodians relies on the notion of separate sovereigns. We often think about -- you know, somebody is in the custody of the state of Kansas when they appear here on a

writ. But he is -- he's in the custody of the executive branch and that includes ICE's ability to detain him.

I haven't been provided any paperwork, I am told there's an ICE detainer, but he's not -- the caselaw is pretty clear that the government has the ability to proceed on both tracks, either with deportation or prosecution, but he is not solely in the custody of the United States Department of Justice or of the U.S. Marshal in this case. There's an ICE hold as well, which means that he's functionally in the custody of both and would be exclusively in ICE custody if the court detained him.

So that's not like a hypothetical, that's something that's going to happen, depending on the court's resolution of things.

Also I think it's sort of counterfactual to say that we're only going to look at his risk of flight if he were released from ICE custody because we don't know what that looks like. We don't know how far away that is. That is something I think the court should evaluate when determining whether there is a -- the government can prove that there's a preponderance of evidence in support of a flight risk because although you don't know what may happen in six months, you do know what's going to happen here in the relatively recent future because none of those immigration processes move fast.

If he's in ICE custody the one thing that will

probably move fast is that he is deported and -- unless he chooses to apply for some exceptional relief. I don't really know what that would be — as I yammer — besides asylum that would allow him to stay in the country.

But I just -- it feels like the government is being -- we all know what's going to happen to him in the short term if the court releases him and the -- guessing about what would have to happen for him to get released, especially given the rates of asylum granted — which I don't know off the top of my head, but I know are low — it just seems like we have to -- the court can only face the decision it has today and that decision is will he be a serious risk of flight if you release him. And the answer is no.

He'll change jails, he'll probably go to Chase County, and then he'll fairly rapidly be deported. And we know in the interim there's only one way for him to get released and there's no facts in support of that way, which is witness protection.

THE COURT: This is bleeding a bit into argument, but in light of the step one analysis it feels like it bleeds into argument necessarily. So let me just ask the question, which is: Your argument reduces the Bail Reform Act to a single factor, which is ICE detention means he cannot constitute a serious risk of flight. And my question is: Where is the basis for that?

We have the Tenth Circuit saying many years ago that an ICE detainer means it's one of the factors you look at amongst all of the other Bail Reform Act factors, but your argument here is saying it is dispositive and I need to ignore every other part of the Bail Reform Act because we've got an ICE hold here.

MR. REDMOND: I very much disagree with that characterization of our argument. I don't think that we're saying that the only thing you care about is the ICE hold. Ms. Lindquist is going to argue about whether -- the *Pavon-Andino* factors. And it's not dispositive in a couple of ways because courts that say it's -- if you have an immigration detainer, that means that you have to release the defendant. Those courts are wrong because it depends on several things, including the kind of immigration detainer, the statutory framework under which that immigration detainer operates, and the country to which the person may be deported.

I mean, if my client is North Korean it's a much different argument than if my client is Mexican or Guatemalan because that immigration detainer is probably not going to be able to be served. I mean, North Korea is not going to allow someone to be deported there. And that's true of a number of countries, especially in Africa.

So the question then becomes is there a third -- kind of third-party country that would take them. And that's a

whole bunch of speculation. That's just a much difficult -- much more difficult thing to weigh.

If you have a client -- or client. If you have a defendant who has an immigration detainer that you know requires detention for some set period of time and who will be -- will be deported to a country that we have a repatriation agreement with, that's much different than the example of the North Korean.

I also think that there's cases in which there's a fact that is not dispositive, but it's fairly overwhelming in the Bail Reform Act analysis. I mean, if my client had escaped from the halfway house and my only release plan is putting him back at the halfway house, the likelihood of that escape recurring is going to have an enormous impact on the court's assessment of the factors.

We are not asking you to say that if there's an ICE detainer that means I have to release. I think it depends a lot on the surrounding circumstances. I think it depends on the potential length of the case. I think if this is a huge drug/wiretap conspiracy case that may last two-and-a-half years, I think the ICE detainer weighs much less in the calculus because the detaining in federal court -- you have no idea what's going to happen, you know, in six months with the ICE case, but you know the federal court -- the federal case is going to last a lot longer.

So I agree with the court that the Tenth Circuit has said, and Judge Crabtree has been very clear, that these are not dispositive. I agree with that. I think it just depends on the circumstances of the ICE hold, the circumstances of the person's native country and then the other *Pavon-Andino* factors.

THE COURT: Thank you.

MR. REDMOND: Thank you.

THE COURT: Ms. Lindquist.

MS. LINDQUIST: The defense is prepared to call Mr. Lucero Bojoguez to testify.

THE COURT: Before we do that, Mr. Bojoguez, I want to make very clear I had previously advised you of your rights to remain silent in all of these hearings. You absolutely have that right here today, which means you do not have to testify on your own behalf and you can sit at the table where you are today and not say a single word.

And the reason I'm advising you of that right is anything you say here today can be used against you. And what that means is the government can use that in the prosecution of this case.

You are going to be advised that you are making statements under oath. If those statements are not true, there could be additional legal consequences for you. There could be new charges brought against you for saying something false here

in court today. So there are very serious and significant potential consequences for testifying today in court.

Nonetheless, you do have the right to testify if you want to here today, but I cannot stress enough that there are serious risks associated with that that could have consequences not just here in this court, they could have consequences in any immigration proceeding and it could result in new or additional charges brought.

So let me give you one more chance to talk to Ms. Lindquist after you've heard me advise you of the rights you have here just to make sure that you do, in fact, want to testify here today.

And let me look over to our interpreter. I do owe you a break every hour or so. We're a little bit before that, but I'm happy to take that break now. That would give me a chance to allow -- you're okay? Let me know whenever you need the break.

Ms. Lindquist, let me give you a chance to talk to him before we move on to any testimony.

(Defense counsel and defendant confer).

THE COURT: Ms. Lindquist, before you say anything on the record, let me say one more warning to Mr. Bojoguez just to make sure that he understands the consequences here.

I understand you may be providing testimony today that could be helpful to the arguments being raised here in court,

essentially hoping that you might be released into ICE custody. If I were to deny that and to grant the government's motion for detention here, this case is going to proceed with two counts, one of which is punishable by up to five years' imprisonment.

And that's not to say that you are either guilty or that there would be a sentence of five years, but I just want to remind you of this additional consequence because I understand why you might want to testify here. But I want to explain you have that additional consequence here if this federal court case proceeds and if you have admitted to anything that then could be used against you here in the federal case.

So let me give you one last chance just to talk to Ms. Lindquist. I wanted to make that clear on the record here today as well.

(Defense counsel and defendant confer).

MS. LINDQUIST: Thank you, Judge. We're prepared.

JHONNY LUCERO BOJORGUEZ,

called as a witness on behalf of the Defendant, having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. LINDQUIST:

Q. Mr. Lucero, can you please state your full name?

A. My name is Jhonny Lucero Bojorguez.

Q. And thank you for standing, Mr. Lucero, but you can

actually remain seated while I talk with you. Okay?

Mr. Lucero, how old are you?

A. Excuse me?

Q. How old are you?

A. I am 29 years old.

Q. Thank you. And are you able to speak English?

A. No.

Q. Are you able to understand English?

A. No.

Q. Mr. Lucero, have you ever been diagnosed with a mental illness?

A. No.

Q. Do you currently use any illegal drugs such as methamphetamine, cocaine or marijuana?

A. No.

Q. Have you ever struggled with using illegal drugs in the past?

A. No.

Q. Do you drink alcohol?

A. No.

Q. Mr. Lucero, what country did you grow up in?

A. In Guatemala.

Q. And are you in contact with any family who still lives in Guatemala?

A. No, I do not have family.

Q. Okay. So you don't have any family that lives in Guatemala or elsewhere?
A. No.
Q. Okay. What about your parents?
A. They died when I was 13 years old.
Q. Okay. Mr. Lucero, when you were arrested did the agents speak to you in Spanish?
A. No, English.
Q. When you were arrested did you understand what the officers were telling you?
A. No, not very much.
Q. In the United States law enforcement cannot physically threaten or injure someone who is under arrest. Is that true in Guatemala?
A. No, I did not understand the question.
Q. So in the U.S. we have a lot of rules about how police can treat people when they are under arrest. I'm curious if -- I'm curious about what that's like in Guatemala.
Are police required to make sure that a person is not injured during arrest, for example?
A. No.
Q. Have you ever been arrested before, Mr. Lucero?
A. No.
Q. And were you injured during this arrest?
A. Yes. Just my arms, my wrists and my elbows.

Q. Okay. And when you say that they were injured, can you describe what those injuries were?
A. What? I didn't understand.
Q. I'm curious, were -- were you bleeding?
A. Yes.
Q. Okay. And was it a lot or a little bit?
A. Not very much, but very little.
Q. Okay. So you would say these were minor injuries that you had but that they were bleeding?
A. Yes.
Q. Okay. Thank you, Mr. Lucero.

MS. LINDQUIST: I don't have any further questions.

MR. HUNTING: No questions, Judge.

MS. LINDQUIST: I have no further questions. I apologize, I was just preparing for part two here.

THE COURT: All right. Mr. Lucero, you may step down.

MS. LINDQUIST: Your Honor, as the court notes, in our society liberty is the norm and detention prior to trial or without trial is the carefully limited exception. We know this from *United States versus Salerno*, 481 U.S. 739. This is a 1987 case that the court and the parties are very familiar with.

The default rule for Mr. Lucero today is that the court shall order the pretrial release of Mr. Lucero Bojoguez unless the government establishes a serious risk by a

preponderance of the evidence, not a hypothetical risk or a possibility, but a serious risk.

Thus, under the Bail Reform Act defendants should generally be released on a personal recognizance bond or an unsecured appearance bond with only two conditions of release imposed: that he not commit a serious crime while on release and that he submit a DNA sample if authorized.

We argue here today that, first of all, the charges do not warrant a hearing under (f)(1). We've talked about it before, but Mr. Lucero faces two charges: one misdemeanor, illegal entry, not re-entry. He does not have a series of prior entries and removals that the court can look to. Count 1 is a felony, he's charged with use of a false statement in an immigration matter. And this is predicated on an application that Mr. Lucero submitted to gain employment in January of 2024, and this is to gain the employment that he still had on the date that he was arrested by law enforcement earlier this year.

The charge is punishable by up to five years' imprisonment, but I will address a little bit later why Mr. Lucero is very unlikely to receive a sentence anywhere near the high end of that range. But also point out here that the Bail Reform Act has (f)(1) because these are the most serious offenses; that if the defendant were to abscond, that it would pose the most risk to the community or it would present a

serious risk of flight or a serious risk of obstruction or intimidation. These are acts that present the greatest risk of -- or, excuse me, the greatest risk to the integrity of the judicial process.

Here, again, Mr. Lucero's only crimes that he's alleged to have committed are to enter the country unlawfully on a first -- a first instance and to have lied on an I-9 Form in order to secure employment on a hog farm that he still worked at two years later when he was arrested.

The government cannot produce sufficient evidence to show serious risk under (f)(2)(A) or (B). And when I made these slides, the government at the initial appearance had announced that they were proceeding under both subsections. Today I understand we have limited it back to (f)(2)(A) as a serious risk that such a person will flee.

Your Honor, Mr. Redmond spoke briefly, corrected my understanding here a little bit of the -- the immigration bond process, so this is not meant to supersede what Mr. Redmond has told the court. He's more read into the INA and into the case that is cited here, *Jennings versus Rodriguez*. So if the court does have additional questions about these, Mr. Redmond I'm sure would be happy to answer these for the court.

However, the point here is that Mr. Lucero lacks a meaningful ability to flee the jurisdiction. And the question that the court has is not that -- it is a good question, it is

very reasonable. But the fact that this question cannot be answered in an easy manner really shows that -- if we have to get this deep into contingencies, that we're not talking about serious risk here and we're certainly not talking about preponderance of the evidence to support that there is a serious risk. We're talking about the kind of remote, speculative possibilities that exist in virtually any case and that Congress did not intend to authorize detention hearings here.

Mr. Lucero has testified today. He's told the court that he grew up in Guatemala and that he was orphaned and unhoused by the age of 13 years old. I apologize, he actually did not say he was unhoused, but he was orphaned at the age of 13 years old. He does not have any relationships to anyone who is presiding in Guatemala today.

He has no physical or mental health conditions. He does not speak or understand English and he does not drink alcohol or use illegal drugs.

Mr. Lucero does have one prior contact with the legal system and this was for a failure to yield at a stop sign. Mr. -- we talked about this earlier, that Mr. Lucero was charged under the surname Guersegey. This is his name, this is on his passport which he did provide to ICE agents when they approached him at the time of arrest.

And we would argue here that this is -- this is

suggestive that Mr. Lucero is likely to come to court if he is somehow released back into the community, although I think under the INA that there is virtually no possibility that he will be released.

In this case, 2024-TR-127, Mr. Lucero was granted diversion. He received this ticket on June 26th, 2024 and he appeared at the initial appearance on July 17th, 2024 where he was fingerprinted and processed. And this is information that I got from the publicly-available docket. I have a copy, a pdf copy of the docket that I'm happy to provide the court as well which shows that on the date that Mr. Lucero appeared in this traffic matter he was actually fingerprinted and processed. And we think that this shows that Mr. Lucero was living openly in Washington, Kansas, he was working openly, and this very much undermines the government's argument that he is a serious flight risk.

Mr. Lucero lacks any meaningful ability to flee the jurisdiction. He does not have significant financial or other resources that would enable his flight, as demonstrated by the fact that he qualified for court-appointed counsel. He has no history of failing to appear. In fact, he has one instance of voluntarily appearing on a non-criminal traffic matter in which he was able to get a diversion agreement which he successfully completed.

Your Honor, I'm going to talk next about the arrest

here and that's because this is relevant to assessing the government's argument that Mr. Lucero is a serious risk of flight.

Mr. Lucero was approached outside of a gas station. I'm showing the court screenshots from the video and we will walk through it here, but what I think is important about this slide is to show that Mr. Lucero was stopped by an unmarked Nissan. And this Nissan is equipped with -- not a light strip on top, but it appears that there are two lights on the top of the windshield and one light that is on the grill of this Nissan.

It's a little bit difficult to see, I'll see if I can zoom in here, but additionally this is an out-of-state plate. So we've got an unmarked car with a Texas tag on the front and this is what Mr. Lucero sees.

So when he is approached agents are speaking to him in English and he is uncertain what is being said to him, but he pulls out his passport and presumes identification would be helpful. And here you can see this is Agent Matthew Johnson who raises his hands to show Mr. Lucero what he wants him to do, to raise his hands in the air. Mr. Lucero complies and he puts his hands in the air.

Mr. Johnson is asking him questions like are you in the country illegally. Mr. Lucero just responds "no" to every question that is asked because he does not understand. He says

no, he tries to hand him the passport, he tries to put his hands up. At this point Mr. Johnson grabs Mr. Lucero's arm to put him in handcuffs and it's at this point that Mr. Lucero appears to try to get back into his vehicle.

We see Mr. Johnson grab Mr. Lucero around the neck area and he is thrown to the ground here in the parking lot of this gas station.

We see Mr. Johnson and Mr. Kernan, who's also an ICE agent, kneeling on Mr. Lucero trying to get both arms handcuffed behind his back. And the difficulty here is that Mr. Lucero does not know what is going on and, admittedly, he is not making it easy for agents to handcuff him. At some point they end up zip-tying him actually.

And so what Mr. Lucero knows is that there are two men who have a vest that does say "Police" on it, they're wearing jeans, they are driving an unmarked Nissan with Texas plates and they are speaking to him in a language that he cannot understand. And this goes on for about ten minutes while officers are struggling to try to get Mr. Lucero handcuffed here.

And here you can see both agents that we have about -- there are two there, they're talking to each other, they're talking about how to get his hands together and Mr. Lucero is on the ground for the entirety of this.

You can see at 17 hours and 13 minutes and 50 seconds

into this video that the agents are looking up and off camera there is a passerby who is observing what is happening. So this passerby presumably offers to help or is asked to help, I'd like to think that he offered and that the agents took him up on it. We now have an unknown person who is assisting agents with the zip-tying of Mr. Lucero in this gas station parking lot after he gets off work.

We can see that they are successful, that Mr. Lucero is now zip-tied. He has one handcuff that is on one wrist and they are trying to get the other handcuff on at this point so they can take the zip ties off. And it's another couple of minutes before Mr. Lucero is actually taken up off the ground.

So here he is. Mr. Johnson is still kneeling on him. And at some point they pick him up and walk him back to this unmarked Nissan where they have a translator on the phone who then advises Mr. Lucero of his *Miranda* rights, which he waives and gives a statement to agents.

Your Honor, we think that this is relevant because we have two agents who go to Washington, Kansas about two hours north of here to arrest a single individual who has no prior criminal history, who is not known to be dangerous in any way. And the circumstances of this arrest and the fact that, again, they only brought two officers, they did not expect that Mr. Lucero was going to be a serious flight risk.

I think that it is -- I think it is difficult to

accept the government's argument that two agents that were sent to Washington, Kansas to arrest Mr. Lucero after he finishes work at this hog farm, that this was an individual who they thought was actually capable of fleeing arrest.

I do want to go back briefly to the conversation about the presence of that detainer and I want to reiterate we're not saying that it is dispositive, but Mr. Lucero's ability to flee is one of the factors. And to the extent that Mr. Lucero is not able to flee of his own volition, that would be an extremely persuasive factor for the court to consider.

And so our argument is that the fact that we are having to dig so deep into the administrative intricacies of ICE and the INA shows that there is not a serious risk. We cannot eliminate all possibility here for the court, we are not immigration lawyers who are versed under the INA. However, it's not Mr. Lucero's burden to show that he is not a flight risk; it is the government's burden to show that he is a serious flight risk, and these circumstances just certainly cannot support that.

Lastly, Your Honor, I just want to situate this case within the broader context. And we are not asking the court to re-litigate or opine on national immigration policy, but this is about showing the court why the government's assessment of this individual's risk should not be -- that that argument cannot carry the day here, Judge, and that's because we have a

detainer here that he -- everyone agrees is in place. He will be going to this detainer. And the government's assessment of risk, it just cannot exist in a vacuum.

Agents arrested Mr. Lucero with the intent to deport him and they've now decided that -- the government has now decided that they will charge him. And they certainly can do both things, but the Bail Reform Act does not permit them to pursue both of these things with Mr. Lucero in criminal custody unless the government can show that he is a serious flight risk.

We have no arguments that he is likely to obstruct justice or to tamper or that he's even dangerous. Not that that is one of the threshold considerations for the court at step one, but the absence is significant for the court here today.

As it relates to Mr. Lucero's guidelines, I do want to share with the court under 2L1.1 that -- this is the statute that -- or the guideline, I apologize, that is applicable to Mr. Lucero's re-entry.

As to the potential penalty, Guideline 2L2.1, base offense level is 11. Three levels off under (b)(1) because the offense was not committed for profit, which means level 8 without any sort of acceptance of responsibility. He has no prior criminal history so we know he's going to fall into criminal history category I, which puts him at a guideline

range of zero to six months. In *Pavon-Andino*, the case that we've been talking about, the court found a potential guideline range of 8 to 12 months weighed heavily in favor of release.

Also on *Pavon-Andino*, we do not have any violations of the terms of supervised release, we do not have multiple unlawful re-entries, we do not have prior failures to appear. In fact, we have one appearance on a non-criminal traffic matter and we have a very relatively low potential penalty here. So while the strength of the evidence may weigh in favor of the government here, that matters very little when the punishment is likely probation.

And I'm happy to answer any questions that the court might have.

I would just note lastly that in this applicable guideline range I say it's likely probation because it is in Zone A under the sentencing guideline grid, which says that isn't -- imprisonment is not required and probation should be considered.

THE COURT: And is your argument with regard to sentencing solely on the entry charge or is that with regard to both of the counts?

MS. LINDQUIST: I believe that it's going to apply to both counts, but Mr. Redmond was...

(Defense counsel confer).

MS. LINDQUIST: This is under the Count 1, the

(indiscernible), Your Honor.

THE COURT: Thank you.

All right. Mr. Hunting, we are back to you and you are welcome to address the proffer and argument all at the same time, however you choose to approach that.

MR. HUNTING: Judge, there is -- in light of the testimony that was presented, there is -- the government does need to present some rebuttal, so we'll call ICE Agent Matt Johnson to the stand.

MATTHEW JOHNSON,

called as a witness on behalf of the Government, having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HUNTING:

Q. Could you please state your name for the record, sir?
A. Matthew Johnson.
Q. And are you currently employed, Mr. Johnson?
A. Yes.
Q. Where are you currently employed at?
A. Homeland Security Investigations in Kansas City, Missouri.
Q. And what do you do for Homeland Security Investigations in Kansas City?
A. I investigate violations of criminal and immigration law.
Q. And were you working for that agency on the date that you came in contact with the defendant?

A. Yes.
Q. And could you describe for us what training and experience you have as -- as -- in the current role that you have?
A. I started with Homeland Security in December of 2023 and prior to that I had been employed by U.S. Customs and Border Protection since July of 2021.
Q. All right. And when you came into contact with the defendant -- when you made contact with him, were you -- what were you wearing essentially?
A. I was wearing my bullet-proof vest, my duty belt. And the vest displayed "Police" on the -- on the front.
Q. And when you came into contact with the defendant, did you identify yourself?
A. Yes, I did.
Q. And how did you identify yourself?
A. I identified myself as an agent of Homeland Security in Spanish.
Q. And when you spoke in Spanish, are you fluent in Spanish?
A. I know enough questions and know how to make enough statements to accomplish law enforcement goals.
Q. Okay. And in this particular instance, why did you speak initially to the defendant in Spanish?
A. I usually try to address subjects in Spanish initially and try to determine if they could speak English. And if they can't, then I will use the Spanish that I know or call our

translation service.
Q. All right. And so in this particular instance, when you came in contact with the defendant you identified yourself as a federal law enforcement official in Spanish. Did he seem to -- did he indicate to you that he understood that?
A. I asked him if he had his identification in Spanish and he provided it.
Q. All right. Did he seem confused at all about providing that identification?
A. No.
Q. What else did you tell him in Spanish?
A. I asked him if he had a visa as I was looking through his Guatemalan passport.
Q. And did he respond?
A. He did, he said no.
Q. And what else did you ask him in Spanish?
A. I asked him in Spanish: In this moment are you in the United States illegally?
Q. And how did the defendant respond?
A. He said no.
Q. And what else, if anything, did you ask the defendant in Spanish at that time?
A. I did not ask him anything additional.
Q. Did you say anything in Spanish after that point?
A. Yes.

Q. What did you say to the defendant in Spanish?
A. I said he did not have a visa and he was in the United States illegally. I told him in Spanish that he had a warrant for his arrest and that he was under arrest.
Q. And did he indicate that he seemed to understand that?
A. He looked at me and he said "no," and he proceeded to try to get back in his car.
Q. All right. And did you prevent him from getting back into the car?
A. Yes, I did.
Q. When you were preventing him from getting back into the car did you try to continue to address him in Spanish?
A. After we were down on the ground, yes.
Q. And what did you tell him in Spanish?
A. I told him in Spanish: You have a warrant, you're under arrest, don't resist.
Q. All right. And did he seem to indicate -- or did he say anything in response to that?
A. The only thing that he said to me during the entire encounter on the ground was "no."
MR. HUNTING: All right. I have no additional questions, Judge.
THE COURT: Thank you.
Mr. Redmond.
MR. REDMOND: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. REDMOND:

Q. Is it special agent? How should I address you?

A. Special agent is fine.

Q. Okay. You testified you were wearing your uniform?

A. Yes.

Q. Does that include -- it looks to me in the -- like you're wearing jeans. Is that what you wear every day?

A. We wear plain clothes, yes.

Q. Okay. And you testified that you spoke to him in Spanish. What's your training in Spanish?

A. I took two semesters of college Spanish and Spanish all through high school and Spanish in sixth, seventh and eighth grade.

Q. And so what would you categorize your level of proficiency as? Are you fluent?

A. I wouldn't describe myself as fluent.

Q. Okay.

A. But I know enough to accomplish law enforcement objectives.

Q. In all instances?

A. I would not say in all instances. In the instances that I have encountered, yes.

Q. You testified that Mr. Lucero was not free to get in the car?

A. I told him that he was under arrest, yes.

Q. Yeah. When you encountered him first, he is under -- he is under arrest very shortly after you encounter him; is that true?
A. Correct.
Q. And you asked him whether he was in the United States illegally?
A. Correct.
Q. It's a crime not to be in the United States legally?
A. Can you repeat that?
Q. Yeah, that's a terrible question. Let me try it again.
It is a crime to be in the United States illegally?
A. Correct.
Q. And, in fact, that was the -- what the warrant was for?
A. The -- yes.
Q. And you asked him if he was in the United States legally and he said no?
A. Correct.
Q. And you didn't Mirandize him before you asked those questions?
A. Those were -- that was an administrative question that had to do with his immigration status which does not require *Miranda*.
Q. Really? So it's your belief that you do not have to Mirandize suspects in custody before you ask them about having committed a crime?

A. For an -- it was -- I had an administrative warrant, so that does not require *Miranda*.
Q. So it's your testimony that you're trained that you do not have to Mirandize people even when they're asking them about whether they've committed a crime?
A. It's my understanding that for an administrative warrant -- if we're not pursuing additional criminal charges, it's just an administrative warrant. And so that does not require *Miranda*.
Q. And you did pursue additional criminal charges?
A. Correct, after I read him his *Miranda* rights using the translation service.
Q. Later?
A. Correct.
MR. REDMOND: That's all I have, Your Honor. Well, actually, let me check. Nope, all done.
THE COURT: Mr. Hunting?
MR. HUNTING: That's it. That's it, Judge.
THE COURT: All right. You may step down. Thank you.
MR. HUNTING: Judge, that's it in terms of proffer. I know -- because we're in this -- kind of this weird spot in terms of all this.
Judge, in terms of the argument that would go towards establishing had the government satisfied its burden for step one, it has indicated at previous hearings and all (indiscernible) all the overlap between the two, step one and

step two if we -- if we get to step two.

Based on the proffered information that is before the court, the government believes it has met by a preponderance of the evidence its burden to establish that the defendant is a serious risk of flight and we are (indiscernible) Title 2 of the detention hearing.

In this particular case the defense, as the court has pointed out, is trying to make this the one and only factor that decides the entire thing for the court and that is not at all what the Bail Reform Act says nor is that how the Bail Reform Act has been interpreted for a very long time.

In this particular case there are some factors under *Pavon-Andino* that do fall in favor of the defendant. There's no question as to that. There is no prior failure to appear that the government is aware of. There is no prior violation of the terms of supervised release that the government is aware of.

That notwithstanding -- and the government acknowledges that there is a difference between what the statutory maximum is and what the guideline range of an imprisonment sentence could be for the defendant if he's in fact convicted. All of those appear to fall more in line in favor of the defendant.

They do not outweigh the other factors that fall in line in favor of the government in that the defendant does have

an incentive to flee as evidenced by his behavior on the date that he was informed by federal officers in his Spanish language that he was under arrest and he said "no" and he attempted to flee.

He has an ability to flee in terms of -- he has several vehicles that were available and registered to him at the address that he was renting, a place to live. And as evidenced by the pretrial services report and the defendant's own testimony, he has little or no ties whatsoever to not only our particular jurisdiction but to the United States.

And his behavior at the time of arrest as well as his behavior while he was entering into the United States illegally as well as securing a job illegally demonstrates that the reliability and the trustworthiness of the defendant are not something to be considered in his favor when you consider the nature of the offense and his own admission to those offenses.

In addition, in this particular case the defendant, when confronted with law enforcement, chose not to comply, Judge, he tried to leave. That is ample demonstration of serious risk of flight.

As to his immigration status, this is not a situation where there isn't a border in place, nor has there been any hearing which the defendant is entitled to before an immigration judge where we don't have any idea, the court doesn't, defense counsel doesn't, the government doesn't have

any idea, one, what the defendant will say at that immigration hearing, or two, what the judge will do at that immigration hearing or, in addition, how long that process will take.

And when you consider all of that uncertainty, that would suggest that it should not be dispositive and it is not as clearcut as the defense would try to frame the argument; that because he has an ICE detainer he's not going anywhere. We don't know that for certain in this particular case.

In terms of the statute that the defense has cited -- and you'll have to forgive me, Judge. In terms of the case and the statute, I was only provided that shortly before the hearing this afternoon and haven't had an opportunity to do a deep dive into what they provided due to the fact that I was tied up in another court hearing prior to this.

That notwithstanding, I don't think there's going to be any dispute that the crime the defendant is charged with in Count 1 would be a crime of moral turpitude. I don't think that that would be up for debate or in dispute. But that particular statute and the context in which they're applying it, the government is not prepared to say that that is the full picture or that that captures the entire context of what that statute means nor how the cases that were decided were being applied to those particular situations. The government simply hasn't had time to review and dive into what they provided shortly before the hearing this afternoon.

The government does believe that the defendant would be entitled to an immigration hearing to determine his status and to determine whether or not he should be subject to removal. He's going to have certain rights for that particular hearing. That's going to take a certain amount of time.

And the court is going to have to make a determination as to whether or not he can or he should be given a bond or he should be held. We just don't know because we don't know what the defendant is going to say at that particular hearing or the way that's going to look from an administrative standpoint.

So with all of that, the government believes when you consider that that fact in and of itself should not be dispositive of the Bail Reform Act and then you combine that with all the uncertainty, that the government has met its burden by a preponderance that he is a serious risk of flight. And we would ask to be allowed to proceed to step two of the analysis, Judge. And if the court has any questions, I'd be happy to answer them, Judge.

THE COURT: Thank you.

MR. HUNTING: Thank you.

THE COURT: Ms. Lindquist.

MS. LINDQUIST: Yes, Your Honor. In summary I want to go back to these *Pavon* factors. The government says that we are distilling our argument that one factor should carry the day here, that the presence of the detainer is dispositive.

That is not at all what we're saying. We'll go back to those factors that the government cited.

We've got incentive to flee here. Under both guidelines, I've now done some homework and looked at 2L2.1 and 2L1.2 which would govern Counts 1 and Count 2 respectively. We know that one has a five-year cap and one has a six-month cap and is a misdemeanor.

Mr. Lucero's guideline range we anticipate will be zero to six months on both charges. And that is, again, based on his criminal history category I with zero criminal history points.

Next I want to talk about his ability to flee. That is what we have spent a lot of time talking about here, is if the court orders him released into immigration custody does he have even the ability to flee? We know that we are concerned with volitional flight, we are not concerned with the situation where the government deports a person before they are able to appear for trial.

We've gone back and forth here. I don't think that there is a black and white answer. I don't think we can tell the court 100 percent for certainty that Mr. Lucero will -- could not in some circumstance get a hearing before an immigration judge.

We do not see the path statutorily for Mr. Lucero to request release in light of the statute saying that because he

has admitted the elements of a crime of moral turpitude that he shall not be released. And I understand it says "pending removal" and that injects some confusion into that statutory scheme because there is no prior order of removal that is automatically reinstated. But nonetheless, the statute is concerned with admissions not convictions.

And so we believe that if the statute were properly analyzed we would anticipate that an immigration judge would do so, that Mr. Lucero would not be given the opportunity to have bond in that immigration matter.

THE COURT: But that statute, 8 U.S.C. Section 1182(a)(2)(i), says, "Somebody who has been convicted" — we clearly do not have a conviction here — "or who admits having committed or who admits committing acts which constitute the essential elements of a crime involving moral turpitude."

We do not have an admission in any court proceeding. We have a not guilty plea from the defendant denying the essential allegations from the government.

So why, as we sit here today, does he even fall within that?

MS. LINDQUIST: My rudimentary understanding here is that we are looking at what did the defendant say. We're looking at his admissions not formally on the record. My understanding of the caselaw is that an individual can make a statement off the record to an agent and based on that

statement be deported based on the admission to a crime of moral turpitude.

THE COURT: And I -- I'm unaware if the defense has cited to a case on that. I'm not challenging that there is a case that does or does not say that, but wouldn't that be the subject of a court hearing?

MS. LINDQUIST: Yes, Your Honor, and that's why I'm saying we can't say with 100 percent certainty that Mr. Lucero will not get a hearing in front of an immigration judge.

But I think, again, the fact that we are struggling to get this deep into the weeds shows that we're not in the serious risk of flight category here. We're talking about a very remote hypothetical that would require a lot of things to happen.

It would require -- you know, it would require Mr. Lucero to request an immigration bond, for a judge to grant a hearing, for a judge to decide after that hearing — where Mr. Lucero would be unrepresented because he does not have the resources to hire an immigration attorney — that he should be given an immigration bond notwithstanding the government's evidence that he has made some incriminating admissions to an ICE special agent. And that -- and then even further that, should Mr. Lucero be released in that situation, that he would violate both orders of release and conditions.

I think we have a record here that shows that he

successfully completed diversion, he appeared on a traffic ticket. He has been in the country living openly, working openly at the same place for at least two years. We think that the ability to flee, while not dispositive, that that evidence does not weigh toward the government today.

THE COURT: What do you mean by working openly? The argument from the government is he used a false Social Security number and a false alien admissibility number to obtain that employment. So what -- help me understand from your perspective what is this open living and working when he is alleged to have been working only because he had provided false information.

MS. LINDQUIST: Yes, Your Honor. The allegation is that he provided this false information in order to secure the employment. We have no -- it is his -- his legitimate name, it is his legal name. He is going to work every day for years, he's living at the same place that his employer pays for. He is going to court in Washington, Kansas and is, you know, able to -- to handle that legal process.

We think that under these set of facts that we've demonstrated that -- we can't say that he's not -- like, the standard here isn't is there a possibility that Mr. Lucero could flee or is it likely that Mr. Lucero will flee. It's is it more likely than not that there's a serious risk that he is going to flee. So under -- again, going back to the *Pavon* --

I'm not trying to say that the ability to flee is dispositive here. I'm saying that that does not weigh toward the government under the facts that we've presented here.

Next we would look to ties to Guatemala or to some other place and Mr. Lucero has testified that he lost both his parents when he was 13 years old and that he does not have family. He is -- he does not have a home in Guatemala, you know, that he could flee to in order to try to escape flight here. He also does not have resources, significant resources that would allow him to purchase a flight or try to get out of the country some other way even if he were released in this case and the immigration case as well.

THE COURT: But his financial affidavit reflects that he has five vehicles.

MS. LINDQUIST: Yes, Your Honor. These are used -- used, old, sometimes working, sometimes not working vehicles and they're all registered in Mr. Lucero's name at the address that he lived at. And so that, again, supports our argument he was living openly, notwithstanding the allegation that he provided a false alien number when all the other information -- it's not alleged that any of the other information was incorrect or that it was false.

Next we look to a history of failures to appear, which we do not have. We have a record of one instance of appearing when the stakes were significantly less than they are here in

this case.

Lastly we look at the violations of supervised release. As the government said, there are no violations of supervised release. In fact, Mr. Lucero would be a zero-point offender, likely eligible to even further reduction actually from Mr. Lucero's six-month range because he would receive a two-level reduction for having no prior criminal history points and a variety of other factors there.

We also do not have repeated re-entries. That's the remaining factor that is considered under *Pavon* in step one.

So I think at best here the government has established a very remote possibility of flight. That is not the serious risk of flight that the court -- that we would expect to see from the government.

THE COURT: Let us take a hypothetical for a moment and put aside the ICE detainer. Is it your argument that if I were to ignore the ICE detainer for a moment that the factors he presents in that scenario do not constitute a serious risk of flight?

MS. LINDQUIST: Your Honor, that's a question I would need to parse through in my head here. If there was not an immigration detainer here?

THE COURT: Correct.

MS. LINDQUIST: I am not prepared to -- I'm having a difficult time stepping outside of that world. The fact is he

does have a detainer and it is extremely relevant here and that's what we are -- we are asking the court to consider.

No, I still don't believe that the government would've shown a serious risk of flight even if Mr. Lucero didn't have an ICE detainer, but the fact is that he does and we're asking a series of hypothetical questions trying to find if there's even a remote possibility that he would have the right to release in immigration proceedings.

THE COURT: Let me ask in terms of an incentive or ability to flee. You mentioned that his employer currently pays for his apartment; is that correct?

MS. LINDQUIST: My understanding is that the employer owned the home and that there -- that Mr. Lucero did not live alone but that there were other individuals who also lived in the home who worked for that -- who worked for that same company.

So we would have a home plan issue if Mr. Lucero did not have an ICE detainer. However, he does have an ICE detainer and he is in the custody of the Executive and we have no reason to believe -- we have no reason to believe he will be released and certainly not a strong reason to believe that he will be released in the immigration proceedings.

THE COURT: Thank you.

Mr. Hunting.

MR. HUNTING: Thank you, Judge.

Judge, to that last particular point, one of the difficulties that has not been addressed by the defendant is if he were released and there were not a detainer, where would he go? There is no release plan, which is further evidence that we have a serious problem here.

He is a serious risk of flight when you consider when he's told in Spanish, "I'm federal law enforcement, there's an administrative warrant out for your arrest and you're under arrest." He says "no," he turns away and tries to get into the car to go away. That behavior in and of itself demonstrates that he is a serious risk of flight, notwithstanding all the other factors that the government has presented to the court for its consideration.

So we would ask that the court find we've met our burden on step one and we proceed to step two, Your Honor.

THE COURT: Let me ask, I have seen the government withdraw its request for detention in other cases involving these complicated immigration issues.

MR. HUNTING: Yes.

THE COURT: Why from the government's point of view is this, as we sit here today, something different that you are still requesting detention?

MR. HUNTING: One, you have the behavior of the defendant at the time of arrest and, number two, there is no order of removal. We do not necessarily know what's going to

happen with this defendant's immigration case and/or status depending on what, if any, information and/or rights he chooses to assert during that.

And that is a very big difference compared to some of the other cases where the government has made a decision based on factors pertaining to those cases in their own little world. But in -- one of the big differences is there's not an order of removal here, Judge.

THE COURT: And from the government's perspective, what are the paths that are potentially available that give the government concern if he were released into ICE custody?

MR. HUNTING: Judge, this is where I -- I can think of one path, which would be asylum. There may be other paths as well or just within the actual just normal, whatever that is, immigration hearing looks like. I don't know enough in terms of what the potential different paths are, but there would be options for the defendant whether he chooses to seek -- or claims fear or not, he's going to be entitled to a hearing. The judge is going to consider when to set that hearing and the judge will have to consider whether or not he should stay detained.

And what that looks like, I don't know how to narrow or winnow that down at this time, Judge. I just don't. I don't have enough expertise in that particular area nor do I think I've got enough information as it pertains to what would

be important to the immigration judge or what all of the options are, Judge. So I apologize.

THE COURT: Ms. Lindquist, are you standing up to say something else?

MS. LINDQUIST: I was just going to add a little bit of context. Mr. Redmond found a report by the American Immigration Council that looked at asylum applications and in fiscal year 2024 there were -- and those individuals who were granted relief waited more than 1,283 days on average for that outcome.

THE COURT: All right. Thank you to the parties for the presentation here today. The first part of this hearing is solely the step one analysis, which is whether the government has met its burden of establishing that it has a right to move for detention.

I do find that the government has met its burden by establishing by a preponderance of the evidence that there is a serious risk that the defendant will flee. There is no argument here about the obstruction so, again, the sole basis here is that there is a serious risk that the defendant may flee.

Everyone here agrees that the mere existence of an ICE detainer is not evidence that defendant will flee, much less serious risk that he will flee, but I have otherwise considered the existence of the ICE detainer throughout the rest of my

analysis and I will explain that.

Again, I do not find that there is clear authority in the Tenth Circuit for exactly which factors I should be considering here today. The parties have agreed on the factors for me to consider and I will apply those factors. Those are generally laid out in the *Pavon-Andino* case out of the District of Colorado.

Walking through these factors, some of these absolutely weigh in the defendant's favor and I will explain those as I go through these factors. We do not have a prior violation of the terms of supervised release. That is a factor that weighs in his favor.

This is not a case in which there are multiple unlawful entries into the United States, we have just one alleged in the indictment. That is a factor that weighs in his favor.

I do not have allegations that he has failed to appear in prior cases. That is a factor that weighs in his favor.

Many of the remaining factors however do not. There is not an allegation that the government has found him in possession of fraudulent identity documents, he is alleged to have been found with a Guatemalan passport. However, we do have the allegation here that he provided — and again, it is an allegation — that he has provided a false Social Security number and a false alien number when he was seeking and

obtaining employment.

As I understand from the affidavit in support of the criminal complaint, the staffing agency, they believed that it may have had identification documents, but it certainly was not able to produce those when requested by the government. So what the staffing agency did or did not do to confirm that information is unknown here today.

We also don't know whether or how he specifically entered the country. There is not a specific allegation that a fraudulent document was used as part of that.

The next factor is the severity of the potential punishment. This is not a case, despite the two counts, that brings with it a significant incarceration. I accept what the parties have argued here, that we are looking in the range of zero to six months, and that may be even on the high side of six months. But what we do have here is detention weighing -- or deportation weighing at the end of any sentence.

So even though the sentence itself may not be high, for somebody who is facing criminal charges here in the United States any potential prison sentence does create some incentive to flee. I don't attribute that to being a high incentive to flee because it is likely to be a short period of incarceration, if any, but it does bring with it the exact deportation issues that we're dealing with here today.

But as I move to the additional factors, these truly

weigh in the government's favor. In terms of the incentive -- well, let me start with the weight of the evidence against the defendant.

He's charged with two counts. Count 1 is the use of a false statement in an immigration matter. There is strong evidence here both in terms of the fact that he is a citizen of another country, we do have a Social Security number and an identification number that is not alleged to be tied to him and then we additionally have his admissions. Those same issues strongly support Count 2.

With regard to his ability to flee, again, we do not know how he entered the United States, which at least shows some ability to flee the jurisdiction. We don't have information about his travel history and related information because he declined to be interviewed by pretrial services.

While he did qualify for the appointment of counsel, the financial affidavit from my perspective underscores that he does have resources that could fund his movement. This is not a situation in which the defendant has reported no resources. He's alleged to own five vehicles, which may or may not all be in working order on any given day, but again, that's showing an ownership of five vehicles.

He additionally reported thousands of additional dollars remaining after his expenses are paid each month as reflected in ECF No. 9. That does show means to potentially

flee here.

I am additionally concerned by the conduct on the day of the arrest. It underscores an ability to flee as well.

When officers allege that he was pulled over, again, as confirmed with the -- the testimony today, there appears to have been approximately a 10-minute incident from the arresting officers and the defendant. And I understand there may well have been language challenges, there may have been concerns on his part as to who was there. But as we heard testimony from our officer today, they were there wearing "Police," there was an attempt to speak in Spanish to the defendant and he is alleged to have actively resisted officers resulting in, again, an approximate 10-minute struggle that resulted in him being placed in the handcuffs on the ground.

We do not have any material ties to this district generally or to the United States.

While he was employed, there, again, is no explanation for how he could have legally been employed. And though his financial affidavit indicates that he expects to have a job after his arrest here, it's unclear how he could be legally employed in this country.

The reason I asked about his apartment is I thought he was living in an apartment that was either provided or made available by his current employer and so that is not a tie he is going to have if he is released from custody in any way.

And so there are no additional community ties or any other ties to the United States here.

I am to consider the reliability and trustworthiness of the defendant. He is alleged to have provided a false Social Security number and an alien number and -- for the purposes of satisfying the requirements to be employed. That gives me concerns about the overall reliability and trustworthiness and, again, he is alleged to have illegally entered the country.

Again, these -- there are -- these factors -- again, the government's burden here is to establish by a preponderance of the evidence that he is a serious risk of flight. And my analysis here is: If defendant were released, I find that he would pose a serious risk of flight at that time. Again, we have no ties of any kind as to why he would stay here in Kansas.

And so the -- the defense's main remaining argument is the impact of the ICE detainer. As I understand the defense's argument, they are primarily relying on 8 U.S.C. Section 1182. Again, that statute, as I read earlier, states and applies only to an alien who has been convicted of a crime involving moral turpitude. We do not have a conviction here.

So the question becomes whether he has admitted in a meaningfully enough way that it falls within this statute of having committed a crime of moral turpitude or admitted

committing acts that constitute the essential elements of a crime of moral turpitude.

Part of the argument here today is the argument that the defendant may not have understood the questions that he was being asked by law enforcement because they may not all have been in Spanish or there may have been issues with him understanding.

Again, we also have a not guilty plea here. On the record before me I do not have a record that I have found or that any other court has found that he has admitted to committing acts that constitute the essential elements of a crime here. That is going to be an issue that the immigration courts may have to resolve before we even know if this part of the immigration statute applies.

But even if it does apply, as we've discussed here today, it is unclear all of the paths that are available to the defendant going forward if he is placed into ICE custody.

As Chief Judge Broomes said right at the end of 2025, "It is entirely uncertain whether ICE would actually take defendant into custody if released by this court or whether ICE would keep him in custody or release him at some other date. As the entity with primary jurisdiction in this matter, the court evaluates defendant as he presents today and declines to speculate on what the future may hold."

This is the case *United States versus Peralta*. This

is an August 25th of 2025 decision by the chief. There are other decisions around the country that address this same issue.

My view of the overall relevance of the ICE detainer here is consistent with what the Tenth Circuit has told me to do, which is, it is relevant to -- as part of the overall history and characteristics of the defendant.

I have considered the ICE detainer in that context here. And what I am not willing to do is to say that an ICE detainer is dispositive of the issue of whether the defendant poses a serious risk of flight.

This to me is no different than a state criminal hold. The Bail Reform Act does not contemplate that a hold by any potential other jurisdiction is the beginning and the end of the Bail Reform Act. It requires me to look on an individualized basis as to each defendant and their unique legal and factual circumstances.

I have no control over what will happen if the defendant is taken into ICE custody. Again, we've discussed all of these various paths that bring with them the possibility that he will be released. And the question before the court is: If the defendant is released, either by my order or else at some unknown period of time in the future, would he pose a serious risk of flight? And I find here that the government has met its burden to establish by a preponderance of the

evidence that there is a serious risk of flight here sufficient that we will move on to step two.

I will write about the step one analysis, but we can now today move on to the step two analysis, which is the traditional 3142 analysis here today.

I am going to take a break to give our interpreter who has been working for two hours — thank you — five, 10 minutes. How much time do you need?

THE INTERPRETER: Fifteen?

THE COURT: Fifteen minutes it is.

THE INTERPRETER: Thank you.

THE COURT: We will be back on the record at 3 -- we'll just say 3:45 and continue with the step two analysis here.

(Recess).

THE COURT: We are back on the record after taking a short break. Prior to taking a break we had completed the step one analysis which now moves us into the step two analysis.

Mr. Hunting, how does the government wish to proceed with regard to that?

MR. HUNTING: By proffer again, Judge.

Judge, essentially we would request that all of the information that was presented to the court in step one be incorporated into this step two as the court now looks to the (g)(2) factors under 3142.

It would be the position of the government that there is sufficient enough evidence here to establish that the government meets its burden by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance if he were to be released for all of the reasons argued and set forth previously.

I believe, Judge, when you take into account the nature and circumstances of the offense, the weight of the evidence against the person and his history and characteristics and that there is no significant family ties or any ties really to not only Kansas but the United States, his lack of legal status, his inability to gain lawful employment, that this defendant is unlikely to appear.

As the court has already found, he's a serious risk of flight so we believe under step two, incorporating all of the information previously presented in step one, that in step two the government there meets its burden as well and would ask that the defendant be detained, Judge.

THE COURT: And, Mr. Hunting, just to be clear, you are not alleging any safety issues in this case. Correct?

MR. HUNTING: We are not, Judge. We are only alleging the concern over flight in this particular case, Judge.

THE COURT: And then one additional question, which is: The (g)(3)(B) factor that I have to consider looks at

whether he was on probation, parole or other conditional release, I don't see that as being a factor that weighs in the government's favor; is that correct?

MR. HUNTING: That is correct, Judge. There's nothing in the pretrial services report nor in any of the other information the government has available to it today that would support a finding in favor of the government under that subsection, so we would ask the court not to do that.

THE COURT: Ms. Lindquist.

MS. LINDQUIST: Yes, Your Honor. We're asking the court to enter an order that in the possibility that Mr. Lucero is to receive an immigration bond, that he immediately report to probation/pretrial services in whatever district that he is released for an ankle monitor to be put on.

What we have today is a conflicting record of what language the agent was speaking when he approached my client and what my client's understanding was of what was being said to him.

There is no conflict in the 2024 traffic case in Washington, Kansas. I proffered it into the record earlier. This is from the pretrial services report, 2024-TR-127. And looking at the publicly-available docket, again, we see that Mr. Lucero received a ticket on the date that he was pulled over and he appeared on a different date out of custody voluntarily at that hearing where he was fingerprinted and

processed. And he had a diversion agreement that he successfully upheld the conditions thereof as evidenced by the fact that he completed diversion and that traffic matter was dismissed against him.

Now, we understand that Mr. Lucero's employment can cut both ways for the court in this analysis here, but we believe that ultimately it is reflective that Mr. Lucero is a responsible person. He was not in the United States using or selling drugs to support himself, which certainly would've gone beneath an I-9 tax radar. He -- he worked in lawful employment but for his citizenship. If he were a citizen we would be here today commending him for the length of time that he worked at that place.

I also just want to point out that Mr. Lucero consented to a search of his vehicle, which corroborates the information that he testified to in terms of he does not use illegal drugs, he does not struggle with those. We also know from that consent search that there were no firearms that were in his vehicle, there was nothing else illegal or that he was prohibited from possessing in his possession.

The court relied in part on Mr. Lucero's admission that he owned several vehicles as one factor supporting his ability to potentially flee. We think that this factor also cuts both ways. Mr. Lucero does have property that he could sell and Mr. Lucero would be able to have a different place to

reside. He does not have to go back to that home. He has money. We've got a small amount of money in checking and then he has those vehicles that he could sell to get an apartment, somewhere locally or at a hotel, while he is on release in this case.

We would also just reiterate that this case is not complicated. It's not going to take months and months to resolve, so we're likely talking about a short period of time here in this hypothetical. If Mr. Lucero were to get an immigration bond, that he would be working with counsel to resolve the pending criminal matter.

THE COURT: Thank you.

Mr. Hunting.

MR. HUNTING: Judge, the defendant has not presented any information as to where he would live if he were released. An ankle monitoring proposal, again, would be insufficient when the court considers its previous findings under step one about the concerns for serious risk of flight. All of those concerns still exist as we stand here and look at it for step two.

And the government would reiterate that we believe we have established by a preponderance of the evidence that there are no conditions or combination of conditions of release that will reasonably assure the defendant's appearance as required, and the proposals made by the defendant fall short in order to satisfy all of the facts that helped establish why he was

considered by the court to be a serious risk of flight.

We would ask the court to detain the defendant, Your Honor.

THE COURT: And we've sort of blended argument and proffer here. Ms. Lindquist, was there anything else?

MS. LINDQUIST: We have nothing further.

THE COURT: All right. I am going to grant the government's motion for pretrial detention. I do not find that there is a statutory rebuttable presumption at issue here and the government has not contended that there is one.

I find that the government has proven by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure that the defendant will appear as required.

I am mindful that I am required to impose the least restrictive conditions necessary to reasonably assure both that the defendant will appear at proceedings in this case and the safety of others.

I've considered the factors laid out in the Bail Reform Act as set forth in 18 U.S.C. Section 3142(g) by taking into account the available information here. That includes all of the information that was part of the step one analysis here today, the proffers and arguments made by counsel as well as the information set forth in the pretrial services report.

And there are factors, just like there were in the

step one analysis, that weigh in your favor and I want to talk about those as I walk through here today.

The (g)(1) factor has me turning to the nature and circumstances of the alleged offense. This is not an offense that is specifically listed under (g)(1) — the two offenses — as the type of offense that weighs in favor of -- weighs in favor of detention.

We're not dealing with a minor victim, controlled substances, a firearm or those. And we also, as I explained earlier, are not necessarily looking at a lengthy period of incarceration, although we do continue to have the concern about deportation.

The (g)(2) factor, I do find there to be strong evidence. Whether it is from the alleged admissions, whether it is from what is detailed in the criminal complaint affidavit, I do find there to be strong evidence here.

When I turn to the (g)(3) factors, again some of these weigh in your favor. I do not find there to be any physical or mental health conditions that would weigh in favor of defendant -- weigh in favor of detention. And I do not see that there is a history of drug or alcohol abuse, so, again, that's a factor that weighs in your favor.

There are no alleged family or community ties here, either to the district or to the United States generally.

While there was a history of employment, there is not

the prospect going forward for legal employment if he were released. And the employment that he did have is obviously subject to whether there was any ability for him to be legally working in this country.

He does have financial resources, which is a factor — I agree with Ms. Lindquist — that cuts both ways. It does provide means for a risk of flight or a risk of non-appearance.

I do not have information regarding the length of his residence in the community. There is not an allegation of a stable residence because where he was living was tied to his previous employer and so I do not have before me a release plan that I could consider that could have weighed in his favor, but I don't have that before me today.

He does not appear to have legal status in the United States and is subject to removal or deportation after serving any period of incarceration and I have not heard that there are any other community ties.

In terms of past conduct, we have the allegation that false information was provided to obtain employment, and that's a factor I have considered here today.

You do not have a lengthy criminal record. That's a factor that weighs in your favor. Again, we have one previous vehicle-related conviction and that's it.

And there is no record of failing to appear at prior court proceedings, and so that is a factor that weighs in your

favor.

The government has not alleged that the (g)(3)(B) factor applies here, which is whether you were on probation, parole or other conditional release at the time of the new alleged offense. And there is not an allegation about danger here if you were released.

The reason that I do not find that any of the proposed conditions or combination of conditions address what I've already determined to be a serious risk of flight is location monitoring, while a bracelet were to stay on you, just tells me where you are at that moment. It doesn't require you to appear as required in court. And, again, because of the concern that I have about the serious risk of flight, bracelets are cut off all the time.

I don't have a history of -- of that in this case, but that is not a condition, particularly when I don't have any plan as to where you would be or ties to that community that address the serious risk of non-appearance and the serious risk of flight that I've already determined in this case.

So for all of these reasons, I find that the government has met its burden here today.

As it relates to the ICE detainer, my analysis in step one in my view applies equally to step two, so that doesn't change my decision here today.

I will write and memorialize my ruling on both of

these steps.

Mr. Hunting, is there anything else to take up today on behalf of the government?

MR. HUNTING: No, Judge. Thank you.

THE COURT: Ms. Lindquist?

MS. LINDQUIST: Your Honor, not that it's dispositive, I understand that it was probably just a misspeak, but I would just for the record say that -- I believe the court said that Mr. Lucero has a traffic conviction. He completed diversion and it was dismissed.

THE COURT: Fair enough. I should correct -- let me officially correct that. He -- there was a -- two charges related to vehicles, he did successfully complete the diversion on that.

I appreciate you making that clear on the record so that that is clear and I will make sure that that language is clear in my order.

MS. LINDQUIST: Thank you, Judge.

THE COURT: All right. Mr. Lucero Bojoguez, what this means is you are remanded back to the custody of the U.S. Marshals and this concludes your hearing here today and all of our hearings this afternoon.

(Proceedings concluded).

* * *

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

January 25, 2026.

/s/ Kelli Stewart
KELLI STEWART, CSR, RPR, CRR, RMR
United States Court Reporter